IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| EMS, INC., a Nebraska Corporation; <br><br>        Plaintiff, <br><br>     vs. <br><br> CHEGG, INC., a California Corporation; <br><br>        Defendant. | **8:11CV113** <br><br> **MEMORANDUM AND ORDER** |

This matter is before the court on the defendant's motion in limine, Filing No. 30 and defendant's motion for partial summary judgment, Filing No. 33. This is an action for breach of contract. Jurisdiction is premised on diversity of citizenship under 28 U.S.C. § 1332.

The plaintiff, EMS, Inc. ("EMS"), is located in Omaha, Nebraska, and is a call center provider that handles inbound and outbound telephone calls for its customers. The defendant, Chegg, Inc. ("Chegg"), is located in Santa Clara, California, and is in the business of renting textbooks and providing other services to college students. EMS and Chegg entered into a Services Agreement ("the Agreement") in November 2010 in which EMS agreed to provide inbound and outbound telephone call services to Chegg. In its complaint, EMS alleges that Chegg breached the Agreement by terminating the contract early. In defense to the plaintiff's claim, Chegg asserts that it had good cause to terminate the agreement due to EMS's prior material breach of the Agreement.

Defendant Chegg moves for partial summary judgment seeking construction and interpretation of the Agreement at issue. Specifically, Chegg seeks a determination as a matter of law that: (1) the Agreement does not require or obligate Chegg to provide

any minimum call volume to EMS; (2) the Agreement is a fee-for-services contract and obligates Chegg to pay EMS for the services actually provided and the hours actually worked by EMS employees on the Chegg account; and (3) the Agreement contains a valid limitation of liability clause that precludes the recovery of consequential damages, including lost profits.

Chegg contends these determinations turn on questions of law pursuant to the language of the agreement.  EMS argues a contrary interpretation and also contends that genuine issues of material fact preclude summary judgment in this matter.  EMS argues that the damages it seeks are not "consequential" damages and are not prohibited by the limitation of liability clause in the Agreement.

Chegg also moves in limine for an order that would prohibit the plaintiff from offering certain evidence of lost-profit damages at trial, contending that such "damages" are not recoverable losses pursuant to the plain language of the Agreement, are not allowable under Nebraska law, or are otherwise barred.  Specifically, Chegg moves to exclude: (1) damages claimed by EMS for alleged loss of revenue; (2) expenses allegedly incurred by EMS to fulfill its obligations under the Agreement; and (3) damages claimed after May 12, 2011.

I.  Facts

In the Order on Final Pretrial conference ("Pretrial Order"), the parties agree to the following uncontroverted issues.[1]  On November 5, 2010, Chegg entered into a written Services Agreement with EMS.   Pursuant to the terms of the Services

---

[1] The final pretrial supersedes the pleadings.  *Friedman & Friedman, Ltd. v. Tim McCandless, Inc.*, 606 F.3d 494, 498 (8th Cir. 2010) (noting that "[its] purpose is to guide the course of the litigation").

Agreement, EMS agreed to provide call center services for Chegg, for customers calls routed to EMS by Chegg. Chegg agreed to pay EMS on an hourly basis for calls handled by EMS. The initial term of the Services Agreement commenced on November 12, 2010. The Services Agreement provides that the agreement could not be terminated by either party for convenience until six months following commencement, unless either party materially breached the terms of the Services Agreement. Chegg terminated the Services Agreement on February 3, 2011. EMS employs its employees on an at-will basis. EMS's call agents, other than supervisors, are paid on an hourly basis. *See* Filing No. 36, Pretrial Order at 2.

The Agreement at issue provides:

> This Agreement may not be terminated for convenience within the first 6 months. The Agreement may be terminated at any time after the first six (6) months for any reason by either party, and such termination may be effected by the terminating party providing the other party with 30 days prior written notice.

Filing No. 1, Notice of Removal, Attachment 1, Complaint, Ex. A, Services Agreement at 2-3, ¶ 2(a). The Agreement also provides that either party could terminate the Agreement on 30 days' written notice in the event of a "material breach" of the Agreement. *Id.* at 3, ¶ 2(c). In that event, however, the Agreement specifies that the breaching party must be notified in writing of the breach and will have 20 days to cure the breach. *Id.*

Schedule B attached to the Agreement contains explicit, month-by-month staffing requirements for EMS, stating "[t]he staff is the minimum that EMS will employ for the Company during this term. Unless directed otherwise by the Company for every 15 Agents EMS will employ one Supervisor." *Id.* at 7, Schedule B. Also included in

Schedule B of the Agreement is a "Company provided volume forecast" for certain call dispositions or contacts. *Id.* The Agreement further provides a payment scale for operation fees and monthly activities, including hourly rates for agent training, account management, dedicated agents and supervisors. *Id.* at 2. Under the heading "Fees; Payment," the contract indicates the figures are based on "monthly usage based off the number of forecasted agents." *Id.*

> The Agreement contains the following "Limitation of Liability" provision:
>
> (a) Except in connection with their Indemnification Obligations under Section 3, in no event will either party be liable for special or consequential damages or for indirect or incidental damages such as, but not limited to, loss of data, loss of use, loss of profits or exemplary or punitive damages.

*Id.* at 4, ¶ 9(a). The damages EMS seeks include charges for an Internet connection system; for rent and operating expenses for a separate facility EMS rented for the Chegg account; recruiting/training for the employees on the Chegg account; Computers/Headsets purchased by EMS for the Chegg account; and employee wages and benefits for the Chegg account in January and February, 2011. See Filing No. 40, Index of Evid., attachment 4, Deposition of Mitchell D. Johnson, Ex. 4.

> The agreement also contains an indemnification clause as follows:
>
> EMS, Inc. agrees to defend, indemnify and hold [Chegg] harmless from and against any liabilities, causes of action, lawsuits, penalties, claims or demands . . . for any damages, costs or expenses resulting from or arising from any breach of any of the covenants, representations or warranties or its performance or nonperformance under this agreement. [Chegg] agrees to defend, indemnify and hold EMS harmless from any third party claim resulting in any loss, liability, or damages or costs resulting from the operation of any product or service that [Chegg] offers which is not part of EMS performance responsibilities under this Agreement.

4

Filing No. 1, Notice of removal, attachment 1, Complaint, Ex. A, Services Agreement at 2-3, ¶ 3(a).

II.   Law

Nebraska contract law governs this diversity action.   *JN Exploration & Prod. v. W. Gas Res., Inc.*, 153 F.3d 906, 909 (8th Cir.1998) (stating "it is axiomatic that federal courts apply state substantive law in diversity suits").   When a federal district court exercises its diversity jurisdiction over claims brought under state law causes of action, it is bound by the state's law as determined by the highest court in that state.   *Foy v. Klapmeier*, 992 F.2d 774, 780 (8th Cir.1993).

Under Nebraska law, "[i]n order to recover in an action for breach of contract, the plaintiff must plead and prove the existence of a promise, its breach, damages, and compliance with any conditions precedent that activate the defendant's duty." *Henriksen v. Gleason*, 643 N.W.2d 652, 658 (Neb. 2002).   In interpreting a contract, the court first determines, as a matter of law, whether the contract is ambiguous.   *Ruble v. Reich*, 611 N.W.2d 844, 849 (Neb. 2000).   A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings.   *Id.*   A determination as to whether ambiguity exists in a contract is to be made on an objective basis, not by the subjective contentions of the parties; thus, the fact that the parties have suggested opposing meanings of the disputed instrument does not necessarily compel the conclusion that the instrument is ambiguous.   *Id.*

If a contract is ambiguous, the meaning of the contract is a question of fact, and a court may consider extrinsic evidence to determine the meaning of the contract.   *Id.*

In contrast, the meaning of an unambiguous contract is a question of law.  *Id.*  When a contract is unambiguous, the intentions of the parties must be determined from the contract itself.  *Id.*  A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms.  *Id.*; *Lexington Ins. Co. v. Entrex Commc'n Servs., Inc.*, 749 N.W.2d 124, 132 (Neb. 2008).

"The terms of a contract are to be accorded their plain and ordinary meaning as ordinary, average, or reasonable persons would understand them." *Ruble*, 611 N.W.2d at 664.  A contract's meaning is to be ascertained by reading the contract as a whole. *See Fisbeck v. Scherbarth, Inc.,* 428 N.W.2d 141, 150  (Neb. 1988).

"In any damage action for breach of contract, the claimant must prove that the breach of contract was the proximate cause of the damages." *Sack Bros. v. Great Plains Co-op., Inc.*, 616 N.W .2d 796, 809 (Neb. 2000). "As a general rule, a party injured by a breach of contract is entitled to recover all damages which are reasonably certain and which are naturally expected to follow the breach." *Phipps v. Skyview Farms, Inc.*, 610 N.W.2d 723, 733 (Neb. 2000).  "[T]he ultimate objective of a damages award is to put the injured party in the same position that the injured party would have occupied if the contract had been performed, that is, to make the injured party whole." *Centurion Stone of Neb. v. Trombino*, 812 N.W.2d 303, 309 (Neb. 2012).  "One injured by a breach of contract is entitled to recover all damages, including the gains prevented as well as the losses sustained, provided the damages are reasonably certain and such as might be expected to follow the breach." *Gary's Implement, Inc. v. Bridgeport Tractor Parts, Inc.,* 799 N.W.2d 249, 257 (2011).

Under Nebraska law, consequential damages, as opposed to direct damages, are those that "do not arise directly according to the usual course of things from the breach itself; rather, they occur as a consequence of special circumstances known or reasonably supposed to have been contemplated by the parties when the contract was made." *Adams v. American Cyanamid Co., 498 N.W.2d 577, 588 (Neb. App. 1992)*. Direct damages refer to those which the party lost from the contract itself—in other words, the benefit of the bargain—while consequential damages refer to economic harm beyond the immediate scope of the contract. *Penncro Assocs., Inc. v. Sprint Spectrum, L.P., 499 F.3d 1151, 1156 (10th Cir. 2007)*; *see* Restatement (Second) of Contracts § 347(a) & cmts. a, c (1981); *Black's Law Dictionary* 416–17 (8th ed. 2004); 24 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 64.12 (4th ed.1993). Lost profits, under appropriate circumstances, can be recoverable as a component of either direct or consequential damages, or both. *Penncro Assocs., 499 F.3d at 1156*. For example, "if a services contract is breached and the plaintiff anticipated a profit under the contract, those profits would be recoverable as a component of direct benefit of the bargain damages"; whereas, if the same breach caused the plaintiff to "close its doors, precluding it from performing other work for which it had contracted and from which it expected to make a profit," those lost profits would be consequential damages. *Id.* (noting that, under normal legal meaning of the terms, "[t]he more general term [consequential damages] informs the subsequently listed examples [including lost profits], not the other way around, and so lost profits here refer only to those that are 'a part or component' of the larger group or class of consequential damages"); *see also Peter Kiewit Sons' Inc. v. ATSER, LP, No. 8:08CV541, 2010 WL 1417811, at *3 (D.*

Neb. Apr. 1, 2010) (finding that a limitation of liability clause providing that no party shall be "liable for consequential, incidental, indirect or special damages, including but not limited to lost profits," did not preclude the recovery of lost profits that are direct in nature because the term "lost profits" as used in the limitation of liability clause was merely an example of consequential, incidental, indirect, or special damages, but can also be an example of direct damages); *Claredi Corp. v. SeeBeyond Tech. Corp.*, No. 4:04CV1304, 2010 WL 1257946, at *5–6 (E.D. Mo. Mar. 26, 2010) (finding a similar limitation of liability clause did not bar the recovery of anticipated profits that were direct in nature, that is, damages which naturally arise out of the breach and which were within the reasonable contemplation of the parties at the time the contract was formed"); *Ingraham v. Planet Beach Franchising Corp.*, No. 07–3555, 2009 WL 1076713, at *1–2 (E.D. La. Apr. 17, 2009) (reconciling a limitation of liability clause that disclaimed recovery for consequential damages and a specific provision for the recovery of actual damages to mean that lost profits proved to have resulted directly from the breach are recoverable, but that any lost profits that indirectly came about are not).

Although the motion in limine is an important tool available to the trial judge to ensure the expeditious and evenhanded management of the trial proceedings, performing a gatekeeping function and sharpening the focus for later trial proceedings, some evidentiary submissions cannot be evaluated accurately or sufficiently by the trial judge in such a procedural environment. *Jonasson v. Lutheran Child and Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997). A motion in limine is appropriate for "evidentiary submissions that clearly ought not be presented to the jury because they clearly would be inadmissible for any purpose." *Id.* In other instances, it is necessary to

defer ruling until during trial, when the trial judge can better estimate the impact of the evidence on the jury.  *Id.*  To the extent that a party challenges the probative value of the evidence, an attack upon the probative sufficiency of evidence relates not to admissibility, but to the weight of the evidence and is a matter for the trier of fact to resolve.  *United States v. Beasley*, 102 F.3d 1440, 1451 (8th Cir. 1996).

    III.  Discussion

        A.  Summary Judgment

Contrary to Chegg's assertion, although the agreement does not explicitly require Chegg to provide a minimum call volume to EMS, the requirement that EMS maintain a certain staffing minimum is the equivalent and produces the same result.  Further, the Agreement, read as a whole, does not appear to be a fee-for-services agreement that obligates Chegg only to pay for hours actually worked by EMS employees on the Chegg account.  The plain language of the contract requires EMS to hire or provide a set number of employees to handle Chegg's call volume during the term of the Agreement. In the contract, the parties agree that EMS would be paid a certain hourly rate for the employees assigned to the account.  That provision of the contract does not equate to a fees-for-services provision.  The staffing requirement and volume forecasts show that the contract was essentially an agreement to maintain a certain capacity to take calls for Chegg.  The volume forecasts indicate the call volume that EMS could expect during the term of the contract.  The inclusion in the contract of the provision that the parties could not terminate the agreement "for convenience" in the first six months equates to a liquidated damages provision, ensuring that EMS would be compensated for the outlays it undertook, in reliance on Chegg's volume forecasts, to perform under the contract.

Further, the court concludes that Chegg's suggested reading of the limitation of liability clause of the agreement is overly narrow.  Giving the terms of the contract their ordinary meaning, the limitation of liability provision draws a distinction between direct and indirect damages and excluding coverage of the latter.  Use of the phrase "but not limited to" when listing examples of consequential, indirect, or incidental damages indicates that lost profits can be an example of such damages.  That is not to say that lost profits are not also an example of direct damages.  By its terms, the limitation of liability clause does not preclude recovery of direct damages that are the result of the breach, which could also include lost profits.  The court rejects Chegg's characterization of all lost profits or lost revenue as "consequential damages" under the Agreement.

The indemnification clause lends further support to this finding.  In the indemnification clause, Chegg agrees to indemnify EMS from any third-party claims, limited to "damages or costs resulting from the operation of any product or service that [Chegg] offers which is not part of EMS performance responsibilities under this Agreement."  In the indemnification clause, the parties manifest an intent to insulate each other from damages, direct or indirect, claimed by third parties, but when it came to insulating EMS from liability to Chegg itself, the limitation covers only those outside the performance responsibilities of EMS.  These distinctions indicate that the parties knew the difference between direct and indirect damages and limited their liability with respect to indirect damages only.  Accordingly, the court concludes that the limitation of liability clause in the agreement does not preclude damages for lost profits that arise directly from the breach itself.

B. Motion in Limine

The foregoing discussion indicates that EMS should be allowed to offer evidence of its benefit-of-the-bargain damages at the trial. Depending on the evidence, EMS may be entitled to claim damages up to either May 12, 2011, or June 12, 2011. The contract specified that, absent cause, Chegg could not terminate the Agreement for the first six months of the initial term of the Agreement, which ended May 12, 2011. The Agreement also requires 30 days' notice to terminate the Agreement for cause, with a 20-day opportunity to cure. The issue of cause is an issue for the jury to resolve. The Agreement does not preclude conveying an intent, before the expiration of the six-month period, to terminate the Agreement for cause at the end of the six-month period, assuming that 20 days were provided to cure any material breach. The court cannot determine as a matter of law that damages can or cannot be recovered for any specific time period until the evidence is more fully developed at trial. Issues of material breach, notice, and timing are fact issues.

The court is not able to evaluate the admissibility of some of the challenged evidence in the context of a pretrial motion. The issue of the admissibility of evidence on damages is dependent on proof of the parties' claims and defenses at trial. The defendant's concerns may warrant a cautionary or limiting instruction, but the court cannot determine the ambit of such an instruction at this time. The court will admit the evidence at issue only on a showing that it is relevant to the issues in the case, and only to the extent that the relevance of the evidence outweighs its potential to cause prejudice or confusion under Fed. R. Evid. 403. The jury will be instructed that it cannot award damages that are speculative or conjectural. The defendant's contentions

11

appear to relate more to the weight to be afforded the evidence and not to its admissibility and are more in the nature of an objection than they are properly the subject of a motion in limine.  The court finds the motion can be adequately resolved at trial, either in a hearing immediately prior to commencement of the trial, as an objection with a sidebar, or with a review of the evidence outside the presence of the jury. Accordingly, the court finds that the motion in limine should be overruled at this time, without prejudice to its reassertion via timely objection to the admissibility of such evidence at trial.

IT IS ORDERED:

1.   The defendant's motion for partial summary judgment (Filing No. 33) is denied.

2.   The defendant's motion is limine (Filing No. 30) is denied without prejudice to reassertion at trial.

DATED this 6th day of November, 2012.

BY THE COURT:

s/ Joseph F. Bataillon
United States District Judge

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.